THE STATE OF KANSAS, *ex rel. Joseph Taggart, as County Attorney, etc.,* v. GEORGE K. ADDISON *et al.*

No. 15,561.   (96 Pac. 66.)

SYLLABUS BY THE COURT.

1. OFFICE AND OFFICERS — *Cities of the First Class — Appointment—Removal.* Kansas City, Kan., is a city of the first class, containing a population of over 50,000 inhabitants. In addition to the elective and appointive officers of such city, as provided by law, "the mayor may appoint such other officers as are credited [created] by ordinance," and may remove the same without cause. (Laws 1905, ch. 114, § 1.)

2. ———— *Veterans' Preference Law.* The provisions of chapter 374 of the Laws of 1907, relating to the appointment and employment of ex-soldiers and ex-sailors, are mandatory upon officers of the state and of the counties, cities and towns thereof when there is an applicant possessing the required qualifications who shows himself competent to perform all the duties which may reasonably be expected to devolve upon him by virtue of such appointment or employment.

3. ———— *Powers of Appointing Officer.* The power to appoint carries with it a presumption that the appointing officer has knowledge of the service to be performed and its require-

ments; also, the power of deciding the question of the competency of the applicants for the service.

4. ———— "*Competency*" of *Applicants*. "Competent" is necessarily a comparative word, and the degree of competency required of applicants by the appointing power is also necessarily discretionary. The utmost good faith, however, is demanded in the determining the qualification of applicants under the ex-soldier's preference law.

5. ———— *Same.* No notice or formal hearing is required; and when the appointing power considers such proof of competency as is furnished by the applicant, together with such personal knowledge as may be possessed and such other pertinent information as may be acquired, and in good faith decides as to the competency of the applicant, such decision is final.

Original proceeding in *quo warranto.* Opinion filed May 9, 1908. Judgment for defendants.

*Joseph Taggart,* county attorney, for plaintiff.

*H. L. Alden,* and *Ralph Nelson,* for defendants.

The opinion of the court was delivered by

SMITH, J.: This original action is brought on the relation of the county attorney of Wyandotte county, to test the validity of certain appointments to city offices of Kansas City, Kan., by the mayor of such city, to have several defendants removed from such offices, and to procure an adjudication that other persons, veteran soldiers, are respectively entitled thereto. The action as to each defendant is several in its nature, but by agreement of the parties and the consent of the court the issues will be determined in this proceeding, although the evidence relating to each appointee and claimant will require separate consideration. The action has been dismissed as to the defendant Larkin Norman, and, by his death, has been abated as to defendant Alex. Eagle.

Dudley E. Cornell is, and has been during all the time involved in the issues, the mayor of Kansas City. About April 9, 1907, the offices of city physician, sanitary sergeant and city engineer became vacant, and it

was the duty of the mayor, by and with the consent of the council, to fill such positions by appointment, which he did.   It is admitted that the claimants for such offices had served in the army of the United States in the war of the rebellion and had been honorably. discharged therefrom, and it is not contended that any of the defendant appointees was such a veteran.   It is correctly asserted by the plaintiffs that by the provisions of chapter 374 of the Laws of 1907 the appointment of each of the defendants was illegal, provided one of the claimants applied for the position before the appointment was made, and was a man of good reputation and competent to perform the duties of such position.

The act of 1907 has been interpreted by this court in an opinion written by one of its veteran members, Mr. Justice Graves, upon a former hearing of this case. (*The State v. Addison,* 76 Kan. 699, 92 Pac. 581.)   That decision is the law of the case, but it remains for the court to determine issues of fact presented by the pleadings and evidence.   The validity of the law is established by the former decision, and it should be so administered as to secure the intended benefits to this honored class of citizens, to whom the nation and the state owe so much.   On the other hand, efficient service to the state and to the counties, cities and towns thereof must not be sacrificed.   The language of the act itself suggests both of these considerations, and even those for whose benefit the law was intended would insist as strenuously upon the latter as upon the former.   In the former opinion in this case Mr. Justice Graves used this language:

"The meaning of the word 'competent,' as used in this statute, is not very clear.   To ascertain the signification intended reference may be made to the subject-matter about which it is used.   'Competent,' when used to indicate the qualifications which a public officer should possess, must necessarily include every qualification essential to the prompt, efficient and honest per-

formance of the duties pertaining to the office to be filled. A law which means less than this can not stand. The maintenance of an efficient public service in all the departments of the government is a matter of paramount importance. Desirable as it may be to confer special public favors upon the rapidly disappearing patriots of this state, it can not be done at a sacrifice of the public welfare.

"Many old veterans remain who are abundantly qualified to meet all the requirements which the best public service may demand, and to such the provisions of the veterans' preference law were intended to apply. The determination of the appointing board or officer as to the qualifications of the applicant involves official discretion, and, when made fairly and in good faith, is final." (*The State v. Addison*, 76 Kan. 699, 707, 92 Pac. 584.)

It was also said in the same case:

"The conditions named in the statute which compel the recognition and appointment of a veteran are: (1) A vacant office; (2) an application by a veteran for appointment to such office who (3) served in the army or navy of the United States in the war of the rebellion and was honorably discharged therefrom, (4) is competent to perform the duties of such office, and (5) sustains a good reputation.

"When these conditions exist it is the duty of the appointing power to appoint the applicant." (Page 705.)

If the veteran claimants were entitled to the offices sought the appointment of the defendants was illegal; otherwise the defendants should not be ousted. We shall, then, proceed to consider the evidence as it relates to each of the three appointments in question.

The evidence shows that Mayor Cornell was himself a soldier of the United States in the war of the rebellion and was honorably discharged from such service and has since been a member of the Grand Army of the Republic. It may therefore be presumed that he did not determine his appointments, generally, with any adverse prejudice against veteran applicants.

C. L. McClung, an honorably discharged veteran,

duly applied for the office of city engineer, and the mayor refused the appointment and appointed defendant McAlpine to that position. Kansas City is the largest city in the state of Kansas, and the evidence shows that the site of the city is quite hilly and is cut by numerous deep ravines, and that the engineering of the present and prospective improvements in the city involves the planning and building of bridges and the planning and constructing of difficult systems of sewers. Mr. McClung had served as assistant engineer and had done some work in railroad engineering, both of which occupations involved little more than the work of an ordinary surveyor. In regard to his qualifications he testified that he was "not a graduate of any school, only theory and practice . . . ; never built nor planned bridges; have planned and helped work at pontoon bridges; never planned a system of sewers; nothing but street grades . . . ; have done all kinds of work as an engineer except bridge work; city engineer is required to do bridge work, viaduct work and construction." Section 84 of chapter 122 of the Laws of 1903 prescribes certain duties of the engineer:

"He shall prepare plans, specifications and estimates for and superintend the construction of all public improvements, do all surveying and engineering ordered by the mayor and council, and perform all other duties pertaining to his office."

The applicant is not, by his own estimate, thoroughly competent to perform the duties imposed by the statute. Other engineers specified particularly the amount and character of work which the city engineer is required to supervise, and, among other statements, it was said that since April, 1907, one hundred and fifty contracts had been let for public works in the city, at a cost of nearly a quarter of a million dollars. Mayor Cornell testified as follows:

"I made an investigation in good faith for the purpose of ascertaining his qualifications for the position of city engineer, and determined in good faith as to his

competency and fitness for such office; from the investigation I made, I did not consider him competent for the position of city engineer."

It appears that the mayor did tender Mr. McClung a position as assistant engineer, which the latter refused. We think the evidence shows that the mayor acted in good faith and after a fair investigation. This, under the rule laid down in the former decision, ends the controversy as to this appointment.

Dr. W. F. Waite duly applied to the mayor for appointment as city physician. He is shown to have been a graduate in medicine and surgery in 1893 from the University Medical College of Kansas City, Mo., and to have been continuously in the practice of his profession since that time, and is shown to have had a good reputation. It appears that he had theretofore occupied the position of city physician in Kansas City, but in his testimony he says that his duties as such were confined almost entirely to looking after smallpox cases. The evidence relating to the qualifications of Doctor Waite, including the testimony of several doctors, seems to be generally favorable to him, except that it does not appear that he was an expert bacteriologist or especially expert in chemical analysis. Mayor Cornell testified in regard to the qualifications of Doctor Waite that he made an investigation as to the applicant's qualifications in good faith, and that in considering the appointment of a city physician he had in mind the duties that would probably devolve upon the city physician in view of the pure-food law that had been enacted; that he thought the city physician ought to be well posted in bacteriology as well as pathology, and from what he learned of the doctor he did not think he was well up in those things; that at the time the appointment was made a pure-food ordinance was under consideration and was shortly afterward passed. It appears to us from the evidence that Doctor Waite was fairly well qualified for the position, except as to

the specialties mentioned. Wonderful advancement has been made recently in these specialties, and, through them, in warding off and stamping out contagious diseases and in guarding against other diseases the seed of which is conveyed through impure or contaminated water, milk, drugs and food. The great city, which is adjacent to, and really a part of, a greater city, with people, resident and passing through its gates, of every nationality, of every degree of opulence, refinement, squalor and debasement, should demand here the last attainment of medical science. The city physician should not only attend the indigent sick but should be competent to guard the cleanly from the diseased and squalid and the squalid from the manner of living that makes them so, and to guard all from the contamination and adulteration to which avaricious commerce subjects the ailments of the body and even the drugs which should heal its ailments. "Competent," always a comparative term, should, as applied to qualifications for this office, be construed in the sense of fully capable of adequately rendering all the services which the welfare of such a city demands. There is no suggestion that the mayor did not act in good faith, although he measured competency by higher standards than had, perhaps, theretofore obtained. His decision in regard thereto is final. The appointment, therefore, of Doctor Eager was not illegal.

As to the claims of F. T. Albertson for the position of sanitary sergeant, to which the mayor appointed defendant Addison, there is a conflict of testimony as to whether Albertson ever applied for the position. Albertson himself testifies that he applied for the position of humane officer but at the suggestion of the mayor he changed the application to that for sanitary sergeant. The mayor testifies that Albertson applied for the position of humane officer and that he did not remember that Albertson made any application for the position of sanitary sergeant. The mayor also testified that he had made no appointment to the position of

humane officer but had decided to devolve the duties of that office upon a deputy sanitary sergeant, and had offered Albertson that position but that Albertson declined to accept it. Other evidence seems to justify the inference that there was a misunderstanding between the mayor and Albertson as to whether Albertson made application for the position of sanitary sergeant. We can not therefore say that the appointment of George K. Addison to the position was illegal.

Judgment is rendered for the defendants.